# UNITED STATES DISTRICT COURT

### for the

### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A GOOGLE SMARTPHONE CURRENTLY LOCATED<br>AT THE ORANGE COUNTY SHERIFF'S OFFICE,<br>HILLSBOROUGH, NORTH CAROLINA | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:23MJ370-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Middle_____ District of _____North Carolina_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(5)(B);<br>18 U.S.C. § 1030(a)(2)(C) | Possession of a firearm and ammunition by an alien admitted to the U.S. under a nonimmigrant visa; Intentionally accessing a computer without authorization or exceeding authorized access to obtain information from a protected computer |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Eric S. Nye
*Applicant's signature*

_____
ERIC S. NYE, SPECIAL AGENT, FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____9/1/2023 4:53pm_____

_____
*Judge's signature*

City and state: _____Durham, North Carolina_____

Hon. Joe L. Webster, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF A | ) | |
| GOOGLE SMARTPHONE CURRENTLY | ) | Case No. 1:23MJ370-1 |
| LOCATED AT THE ORANGE COUNTY | ) | |
| SHERIFF'S OFFICE, HILLSBOROUGH, | ) | |
| NORTH CAROLINA | ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Eric Nye, Special Agent (SA), Federal Bureau of Investigation (FBI), Charlotte Division

(CE), Raleigh-Durham Resident Agency, Cary, NC, being duly sworn, states the following:

## INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the meaning

of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations and to make arrests for offenses enumerated in Title

18 U.S.C. § 2516.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so

employed since 2006. I have authored, executed, and/or participated in over fifty search and

seizure warrants for illegal narcotics and related paraphernalia. I have participated in the operation

and execution of over thirty Federal and State Title III orders. I have arrested and/or participated

in the arrest of over 100 persons for violations of State and Federal narcotics statutes. I am currently

assigned to investigate violent gangs in the Durham metropolitan area as a member of the FBI's

Raleigh-Durham Safe Streets Task Force (RDSSTF) and have received over 100 hours of

specialized training in the area of illegal narcotics and violent street gangs. Additionally, through

my investigation of gangs and gang members, I have become familiar with how individuals obtain,

transport, store, and conceal firearms.

1

3.     Further, based on training, knowledge, and experience your affiant knows that evidence of firearms possession will often be maintained in a person's residence and/or vehicle. Specifically, items such as receipts, gun boxes, ammunition boxes, firearm cleaning supplies, range gear, and records of range use will often be maintained in those locations. Additionally, items, such as cellphone and laptops, used to facilitate the research of firearms, types of ammunition to be used, range locations, and other firearms specific questions will be maintained on such electronic devices, including photograph of firearms, ammunition, and firearms related information.

4.     This affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a Google smartphone (the "SUBJECT DEVICE") recovered from TAILEI QI at the time of his arrest, further described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

5.     This affidavit is based upon information I have gained through this investigation, as well as information from other law enforcement officers and individuals associated with this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 922(g)(5)(B) and Title 18, United States Code, Section 1030(a)(2)(C) is stored within the SUBJECT DEVICE, and that the search will result in the identification of property evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing these crimes.

## JURISDICTION

6.     A "magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the district." Fed. R. Crim. P. 41(b)(1).

## RELEVANT STATUTES

7. 18 U.S.C. § 922(g)(5)(B) criminally punishes, "any person—(5) who, being an alien, (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26))."

8. 18 U.S.C. § 1030(a)(2)(C) criminally punishes, "Whoever—(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—(C) information from any protected computer."[1] A "protected computer" includes, "a computer—(B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." § 1030(e)(2)(B).

## PROBABLE CAUSE

### Investigation into TAILEI QI and the Murder of Z.Y. at UNC Chapel Hill

9. On August 28, 2023, at approximately 12:58 p.m., officers with the University of North Carolina Campus Police Department responded to "shots fired" call at Caudill Labs located at 131 South Road, Chapel Hill, NC 27514.

10. Upon arrival, officers located a deceased Asian male in an office area that appeared to have suffered from multiple gun shots. Multiple witnesses at the scene informed officers that they knew the shooter and provided his name as TAILEI QI. The witnesses provided a clothing description of QI. One of the witnesses was in an adjacent office, heard the argument between QI and the victim, and then heard five gunshots. The witness exited his office and saw QI walking by with a gun in his hand.

---

[1] Definitions of terms used in this statute can be found in Subsection (e). 18 U.S.C. § 1030(e).

3

11.    Shortly after the officers arrived, CHPD received a 911 call about an unidentified male running in the woods behind Williams Circle near Barkley Drive in Chapel Hill. The caller provided a description of the male wearing a grey shirt. This description was consistent with the one provided by the witnesses to the shooting. This location is approximately one mile south of the QI's residence located at 109 Shadowood Drive, Apt. P, Chapel Hill, North Carolina. This location indicated a route of travel, on foot, from the crime scene, north towards QI's residence. The distance from the crime scene to QI's arrest location was approximately two miles and should have been covered on foot in no more than 45 minutes. The time of this arrest was 2:38 p.m., a duration of approximately two hours and 45 minutes. Based on training, knowledge, and experience your affiant is aware that this extended duration indicates that QI was likely attempting to avoid detection from law enforcement, and possibly attempting to destroy or hide evidence during this period of time. Furthermore, this timeline would have allowed QI to access his vehicle, his residence, or both, prior to his arrest.

12.    CHPD made contact with the suspect, QI, and he was detained without incident. He was transported back to campus by the police and was positively identified by an eyewitness as the shooter.

13.    At the time of QI's detention, he was not in possession of the firearm. He was in possession of a light blue, Google cellular phone with the words "NANOHEROS" etched into the back of the phone, i.e., the SUBJECT DEVICE.

14.    At the crime scene officers recovered multiple spent shell casings from Sig Sauer 9mm Luger ammunition.

15. A 2014 Nissan Versa bearing North Carolina registration TJN4072,[2] was located by police in an adjacent parking lot to the crime scene. This vehicle is registered to QI at the 109 Shadowood Drive, Apt. P, Chapel Hill, NC.

16. Your affiant interviewed QI and he admitted being at the lab the morning of the shooting but he asserted that he received an alert of a shooter on campus and decided to go home. QI denied being in any altercation with the victim and explained that he left his vehicle at the lab and decided to walk home for exercise.

17. QI denied owning or possessing a pistol but admitted to shooting a pistol at a firing range two weeks ago. The firearm was rented at the shooting range, and he fired with the instructor. QI could not remember the name of the range. He admitted that he used his phone to search Google for the range location.

18. QI denied possessing a firearm but was confronted with the possibility that depending upon where the firearm was placed a child could find the firearm and hurt themselves with it. When asked by an investigator if a child could find the firearm he shook his head in a manner indicating, "No." Federal and local law enforcement officers have made a diligent search for the firearm in public places, but the firearm used in this murder has yet to be located.

### Evidence Provided by a Firearms Range in Wake County, which was Utilized by TAILEI QI

19. On August 29, 2023, a firearms range located in Wake County, within the Eastern District of North Carolina, contacted law enforcement after seeing news reports of the shooting on the campus of UNC. They recognized the suspected shooter as someone that had recently fired at their range. Your affiant met with the range management who explained that QI had visited their

---

[2] Vehicle Identification Number (VIN) was recorded as 3N1CN7AP8EL839992.

5

establishment on two occasions. In QI's application paperwork to create an account and utilize the range, he listed his "Emergency Contact" as Z.Y. (the Victim).

20.    The range management explained that QI fired at their range on August 17, 2023. On that date he rented a Glock 43X, 9mm pistol from them. QI also fired on August 27, 2023 (the day before the murder), in which he again rented a Glock 43X, 9mm pistol. After completing his time on the range, QI purchased a box of Sig Sauer[3] 9mm Luger hollow points. He left the establishment and walked to his car. A few minutes later QI returned and bought an additional box of the same Sig Sauer 9mm Luger ammunition. The range management provided documentation and receipts for these interactions. Additionally, range management provided video evidence of QI's time in their store and on the range firing.

### Search of 109 Shadowood Drive, Apt. P, Chapel Hill, NC (QI's Residence)

21.    On August 29, 2023, a search warrant was authorized in the Middle District of North Carolina for 109 Shadowood Drive, Apt. P, Chapel Hill, NC. This was QI's residence. During that search agents recovered a notebook with notes indicating login information for two different firearm websites designed for peer-to-peer sales and firearms related discussions. Additionally, a note was located which read, "Glock 43X" next to a username from one of the sites, and "CZ-75" next to different username from the site. These firearms are both chambered in 9mm. Additionally, a Glock model 43X was the firearm that QI was training with at the range the day before the murder. Additionally, receipts were located in QI's apartment from the firearms range in Wake County, which corresponded to records provided by that business to investigators.

---

[3] Sig Sauer 9mm Luger casings were recovered from the crime scene.

## Search of a 2014 Nissan Versa (QI's Vehicle)

22.   On August 28, 2023, a search warrant was authorized in the Middle District of North Carolina for QI's vehicle, identified as a 2014 Nissan Versa bearing North Carolina registration tag TJN4072. Agents recovered multiple items of evidence. Of note, an empty plastic ammunition insert was seized from the vehicle. Such inserts are used as packaging to organize the rounds inside of a box of ammunition.

## Purchasing of Firearm by TAILIE QI

23.   Upon review of the note found inside of QI's apartment, agents were able to determine a username immediately adjacent to the words "Glock 43x." It was determined that this was a username from the domain www.carolinafirearmsforum.com. On August 31, 2023, contact was made with this user who indicated he had sold a Glock 43X to an Asian male a few days prior. Agents met with this individual in the Charlotte area at which time he positively identified a picture of TAILIE QI as the individual that purchased the Glock. The witness said that QI was driving a silver car, which investigators believe was QI's Nissan Versa. The seller of the firearm provided agents with the serial number of the firearm.

24.   The seller also provided agents with screen captures of text messages he had with QI in the coordination of the sale of this firearm. The cellular telephone number QI was utilizing to coordinate this illicit firearms deal was (225) 588-8536. That cellular telephone number is associated with the SUBJECT DEVICE currently in the custody of the FBI and located at the Orange County Sheriff's Office. It was initially recovered from QI's person at the time of his arrest by the Chapel Hill Police.

25.   Based on training, knowledge, and experience, your affiant is aware of the standard magazine size of a Glock 43X is ten rounds. Based on initial analysis of the crime scene,

7

investigators determined, based on the spent shell casings found at the scene, that QI fired ten rounds during this shooting. This further substantiates the likelihood that QI utilized a Glock 43X to commit the murder of Y.Z. and that QI fired at the victim until he ran out of ammunition.

**Unauthorized Access**

26.     The UNC IT Department explained that a student account had been accessed by someone other than the account holder (a student). They were originally informed of this unauthorized access by the student. The student, who was outside the United States at the time, was unable to access her UNC account which was hosted on the UNC computer system on or about August 1, 2023. Through a family member she contacted the IT Department on or about August 1, 2023 regarding the loss of access to her account. Upon later review, the IT Department determined that a male person had accessed the student account without authorization. Specifically, that male person placed a call to the UNC help desk and socially engineered access to the account. The help desk, having been tricked, changed the student's account settings to allow for two-factor authentication numbers to be sent to telephone number (225) 588-8536. This telephone number is the call number assigned to the SUBJECT DEVICE that belonged to QI.

27.     Additionally, the IT Department confirmed that two-factor authentication messages were sent to the SUBJECT DEVICE. This allowed QI to gain unauthorized access to the student account on or about August 1, 2023. After the unauthorized access to the student's account, e-mails from the student's account were then downloaded to some external device connected to the UNC computer system network.

28.     During an interview, QI admitted to this unauthorized access to your affiant.

## Immigration Status

29.   A query with the US Immigration and Customs Enforcement confirmed that QI was legally present in the United States on a F1 nonimmigrant student visa. Furthermore, in order to obtain a student visa, QI had to apply for the visa and State Department and Department of Homeland Security records indicate that QI applied for and received at least one extension of the student visa. His application and renewal of the visa show he knew his nonimmigrant student visa status.

30.   QI's start date with UNC was listed in DHS paperwork as January 10, 2022. This documented his approval to be transferred from LSU at that time. The DHS documents listed QI's cellular number as the SUBJECT DEVICE. The investigation has determined QI and Z.Y had a professional and academic relationship.

## Nexus Examination

31.   The above listed ammunition, recovered on August 28, 2023, in Chapel Hill, North Carolina, is ammunition as defined in Title 18, United States Code, Section 921(a)(17)(A). This ammunition was not manufactured in the State of North Carolina, and therefore must have been shipped or transported in interstate or foreign commerce.

32.   The above-described firearm, a Glock model 43X, not yet recovered, is a firearm as defined in Title 18, United States Code, Section 921(a)(3). This make and model firearm was not manufactured in the State of North Carolina, and therefore must have been shipped or transported in interstate or foreign commerce.

33.   Based on the above-documented evidence, your affiant asserts that there is probable cause to believe that TAILEI QI, knowing his status as an alien with a nonimmigrant visa, illegally

possessed a firearm and ammunition and that there is evidence of that crime in the SUBJECT DEVICE.

34. The SUBJECT DEVICE is currently in the lawful possession of the Orange County Sheriff's Office in Hillsborough, North Carolina, within the Middle District of North Carolina. In my training and experience, I know that the SUBJECT DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the possession of the FBI.

**TECHNICAL TERMS**

35. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include

global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved

11

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12

36. Based on my training, experience, and research, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

38. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

13

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to obtain unauthorized access to a victim electronic device over the Internet, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

14

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

41. Based on the foregoing facts, I further respectfully submit that there is probable cause to search the SUBJECT DEVICE described in Attachment A to seize evidence, contraband, fruits, and/or instrumentalities of a crime, namely, violation of 18 U.S.C. § 922(g)(5)(B), possession of a firearm and ammunition by an alien admitted to the United States under a nonimmigrant visa, and 18 U.S.C. § 1030(a)(2)(C), intentionally accessing a computer without authorization or exceeding authorized access to obtain information from a protected computer.

/s/ Eric S. Nye
Eric S. Nye, Special Agent
Federal Bureau of Investigation
United States Department of Justice

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 1st day of September, 2023, at 4:53 p.m.

Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

## ATTACHMENT A

### *Property to be searched*

The property to be searched is a Google smartphone, unknown model, light blue in color, recovered from TAILEI QI's person at the time of his arrest on August 28, 2023, (hereinafter the "SUBJECT DEVICE"). The SUBJECT DEVICE is currently located at the Orange County Sheriff's Office in Hillsborough, North Carolina.

The following is a photograph of the SUBJECT DEVICE:



This warrant authorized the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

1

**ATTACHMENT B**

*Property to be seized.*

All records on the SUBJECT DEVICE described in Attachment A that constitute evidence of a crime, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing a crime, in whatever form and however stored, regarding violations of 18 U.S.C. § 922(g)(5)(B), possession of a firearm and ammunition by an alien admitted to the United States under a nonimmigrant visa, and 18 U.S.C. § 1030(a)(2)(C), intentionally accessing a computer without authorization or exceeding authorized access to obtain information from a protected computer, committed by TALEI QI ("the Subject") in the form of:

A. Electronic documents, records, data, videos, photographs, text messages, and other electronic communications, from January 10, 2022, through August 28, 2023, regarding:

    a. firearms, ammunition, firearm magazines, firearms research, firearm and ammunition sales and purchases, and Internet searches for shooting ranges;

    b. other electronic devices that the SUBJECT DEVICE connected to or communicated with on the UNC computer system network or telephone network;

    c. the subject's immigration status and the subject's knowledge of his status;

    d. showing the Subject's intended use of firearms and/or ammunition;

    e. reflecting the Subject's motive for the use, possession, or intended use of the firearm and ammunition, and the shooting Z.Y.;

    f. showing the Subject's relationship with Z.Y.;

1

g. showing the motive for the Subject's unauthorized access of the other student's UNC account;

B. Electronic location data stored on the device that would indicate the location of the device and device network connection history, during the period from August 17, 2023 through August 28, 2023;

C. Evidence of who used, owned, or controlled the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

D. Evidence of software, or the lack thereof, that would allow others to control the SUBJECT DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

E. Evidence of the attachment to the SUBJECT DEVICE of other storage devices or similar containers for electronic evidence;

F. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICE;

G. Passwords, encryption keys, and other access devices that are stored on the SUBJECT DEVICE that are necessary to access the SUBJECT DEVICE or contents stored on the SUBJECT DEVICE;

H. Records of or information about Internet Protocol addresses used by the SUBJECT DEVICE; and

2

I. Records of or information about the SUBJECT DEVICES's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses that pertain to the events of August 28, 2023 involving the shooting of Y.Z., and the unauthorized access of another student's UNC account on or about August 1, 2023.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If, during the execution of this warrant, the government discovers materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue its review until the potentially protected materials have been segregated from other evidence obtained under this warrant. Prior to any further review of the identified potentially protected materials, the Government will notify the Court of the need to establish a court-approved process for review and filtering of the potentially protected materials.